MOISES A. AVILES (226569)
AVILES & ASSOCIATES
560 N. Arrowhead Av., #2A
San Bernardino, CA., 92401
TEL.: (909) 383-2333
FAX: (909) 383-9550
maviles1231@aol.com

Attorney for Plaintiffs
JORGE MEJIA, and ROSA MEJIA

# UNITED STATES DISTRICT COURT,

## CENTRAL DISTRICT OF CALIFORNIA.

| | |
|---|---|
| JORGE MEJIA, and ROSA MEJIA, | Case No. CV 09 - 05476 SVW (FFMx) |
| Plaintiffs, | VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY RELIEF, AND DAMAGES FOR CONTINUING VIOLATION OF CIVIL RIGHTS, AND CONSPIRACY TO VIOLATE CIVIL RIGHTS IN VIOLATION OF THE FIRST, FOURTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION |
| v. | |
| COUNTY OF SAN BERNARDINO, JOSIE GONZALES, as Supervisor, RUTH E. STRINGER, as County Counsel, PAYMON Z. BIDARI, as Deputy County Counsel, S. MARK STRAIN, as Deputy County Counsel, ROD HOOPS, as Sheriff-Coroner, MICHAEL RAMOS, as District Attorney, SAN BERNARDINO ANIMAL CONTROL DEPARTMENT, SAN BERNARDINO COUNTY FIRE DEPARTMENT, MS. IGLESIAS, as Fire Department Inspector, , and DOES 1-10, inclusive, | DEMAND FOR JURY TRIAL. |
| Defendants. | |

MOISES A. AVILES (226569)
AVILES & ASSOCIATES
560 N. Arrowhead Av., #2A
San Bernardino, CA., 92401
TEL.: (909) 383-2333
FAX: (909) 383-9550
maviles1231@aol.com

FILE COPY

Plaintiffs allege:

1. Plaintiffs bring this lawsuit to challenge the actions, including for continual harassment tactics, i. e., searches without probable cause with guns drawn like it was straight out of Nazi Germany, of County of San Bernardino; Josie Gonzales, as Supervisor; Ruth E. Stringer, as County Counsel; Paymon Z. Bidari, as Deputy County Counsel; S. Mark Strain, as Deputy County Counsel; Rod Hoops, as Sheriff-Coroner; Michael Ramos, as District Attorney; San Bernardino Animal Control Department; San Bernardino County Fire Department; Ms. Iglesias, as Fire Department Inspector; Superior Court of the State of California, in and for the County of San Bernardino; and DOES 1-10, inclusive, in the above-entitled action for engaging in an illegal scheme to violate §1 of the Civil Rights Act of 1865, 42 U. S. C., §§1985(3); and for engaging in an illegal scheme to violate §1 of the Civil Rights Act of 1871, 42 U. S. C., §§1983. Defendants are County of San Bernardino; Josie Gonzales, as Supervisor; Ruth E. Stringer, as County Counsel; Paymon Z. Bidari, as Deputy County Counsel; S. Mark Strain, as Deputy County Counsel; Rod Hoops, as Sheriff-Coroner; Michael Ramos, as District Attorney; San Bernardino Animal Control Department; San Bernardino County Fire Department; Ms. Iglesias, as Fire Department Inspector;; and DOES 1-10, inclusive The jurisdiction over this action is conferred by 28 U.S.C. §§1331, and 1343.

## I. FIRST CAUSE OF ACTION BROUGHT BY PLAINTIFFS AGAINST ALL DEFENDANTS FOR VIOLATION OF CIVIL RIGHTS.

2. Plaintiff Jorge Mejia, was, and at all times herein mentioned is a resident of the County of San Bernardino, State of California.

///

Complaint for Violation of Civil Rights –Mejia v. County of San

Bernardino - 2

MOISES A. AVILES (226569)
AVILES & ASSOCIATES
560 N. Arrowhead Av., #2A
San Bernardino, CA., 92401
TEL.: (909) 383-2333
FAX: (909) 383-9550
maviles1231@aol.com

3. Plaintiff Rosa Mejia, was, and at all times herein mentioned is a resident of the County of San Bernardino, State of California.

4. Defendant County of San Bernardino ("County"), was, and at all times herein mentioned is the duly established chartered county duly created under the laws of the State of California.

5. Defendant Josie Gonzales, was, and at all times herein mentioned is the duly elected Supervisor of Defendant County.

6. Defendant Ruth E. Stringer, was, and at all times herein mentioned is the duly appointed County Counsel of Defendant County.

7. Defendant Paymon Z. Bidari, was, and at all times herein mentioned is the duly appointed Deputy County Counsel of Defendant County and was the deputy county counsel whose unbridle and unfettered unconstitutional authority resulted in the violation of Plaitiff's civil rights.

8. Defendant S. Mark Strain, was, and at all times herein mentioned is the duly appointed Deputy County Counsel of Defendant County and was the subsequent deputy county counsel whose unbridle and unfettered unconstitutional authority resuted in the violation of Plaintiffs' civil rights.

9. Defendant Rod Hoops, was, and at all times herein mentioned is the duly elected Sheriff-Coroner of Defendant County.

10. Defendant Michael Ramos, was, and at all times herein mentioned is the duly elected District Attorney of Defendant County whose failure to supervise the deputy county counsels of the County of San Bernardino, who claim cross-deputatization, resulted in the violation of Plaintiffs' civil rights.

11. Defendant San Bernardino Animal Control Department, was, and at all times herein mentioned is the duly created department of Defendant County.

///

Complaint for Violation of Civil Rights –Mejia v. County of San

Bernardino - 3

MOISES A. AVILES (226569)
AVILES & ASSOCIATES
560 N. Arrowhead Av., #2A
San Bernardino, CA., 92401
TEL.: (909) 383-2333
FAX: (909) 383-9550
maviles1231@aol.com

12. Defendant San Bernardino Fire Control Department, was, and at all times herein mentioned is the duly created department of Defendant County.

13. Defendant Ms. Iglesias, was, and at all times herein mentioned is the duly employed Fire Department Inspector of Defendant County.

14. Defendant Superior Court of the State of California, in and for the County of San Bernardino ("Superior Court"), was, and at all times herein mentioned is the duly authorized Court of the State of California, sitting in San Bernardino, California.

15. Plaintiffs are ignorant of the true names and capacities of Defendants sued in this Complaint as Does 1-10, inclusive, and therefore sue these Defendants by these fictitious names. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained. Plaintiffs are informed and believe and allege on this information and belief that each of the fictitiously named Defendants is negligently responsible in some manner for the occurrences alleged in this Complaint, and that Plaintiffs' injuries as alleged in this Complaint were proximately caused by that negligence.

16. At all times mentioned in this Complaint each of said Defendants was the agent and employee of each of the remaining said Defendants, and in doing the things alleged in this Complaint, was acting within the course and scope of this agency and employment.

17. At all times hereinafter mentioned, each and all of the acts of the Defendants alleged herein were done by the Defendants under the color and pretense of the statutes, regulations, customs and usages of the State and under the authority of their offices as heretofore alleged herein.

///

///

Complaint for Violation of Civil Rights –Mejia v. County of San

Bernardino - 4

MOISES A. AVILES (226569)
AVILES & ASSOCIATES
560 N. Arrowhead Av., #2A
San Bernardino, CA., 92401
TEL.: (909) 383-2333
FAX: (909) 383-9550
maviles1231@aol.com

18. Plaintiffs, who are Latinos, were deprived of their liberty, property and freedom of speech interest protected by the Constitution and/or laws of the United States of America, and each and every Defendant caused, by commission or omission, such deprivation while acting under color of law.

19. All acts and/or omissions perpetrated by each Defendant were engaged in maliciously, callously, oppressively, wantonly, recklessly, with deliberate indifference to the rights already violated, despicably, with evil motive and/or intent, in disregard of the rights of the Plaintiffs.

20. Defendant County and any Defendant in his/her official and/or individual capacity knowingly, or grossly negligently, or with deliberate indifference to the rights allegedly violated, conspired to cause to come into being, maintained, fostered, condoned, approved of, either before the fact or after the fact, ratified, took no action to correct, an official policy, practice, procedure, or custom of permitting the occurrence of the categories of wrongs set forth in this pleading, and/or improperly, inadequately, with deliberate indifference to the constitutional or other federal rights of persons, grossly negligently, with reckless disregard to constitutional or other federal rights, conspired to violate civil rights, so that each one of them is legally responsible for all of the injuries and/or damages sustained by the Plaintiffs pursuant to the principles set forth in *Monell v. New York City Dept. of Social Services* and its progeny. Furthermore, the actions of Defendant County, each follow a policy of "no policy" in protecting the rights of property owners, and that the individual Defendants have demonstrated a lack of training and guidance in the protecting of the constitutional and civil rights regarding the protection of property owners.

///

Complaint for Violation of Civil Rights –Mejia v. County of San

Bernardino - 5

MOISES A. AVILES (226569)
AVILES & ASSOCIATES
560 N. Arrowhead Av., #2A
San Bernardino, CA., 92401
TEL.: (909) 383-2333
FAX: (909) 383-9550
maviles1231@aol.com

21. In or about 2002, Plaintiffs bought their property from Mr. Rodriguez, the previous owner. Mr. Rodriguez also used the property as a trucking business, which also had a fuel pump.

22. In or about 2005, both Plaintiffs participated as proponents and in collecting signatures to have Defendant Gonzales face a recall election. Plaintiffs and other proponents of the Recall Petition objected to Gonzales' attempts to have the unincorporated communities of Bloomington and Muscoy redeveloped causing many businesses to be condemned for private uses, such as shopping centers, and condominiums.

23. After Plaintiffs and other recall proponents did not obtain enough signatures, Defendants County, and the Office of County Counsel, targeted Plaintiffs and a few others by citing them for allowing them to park trucks on their private property. The County also does not allow trucks to be parked on the street, even though that is rarely enforced. That is other similarly situated individuals with the same trucking parking businesses as Plaintiffs were not targeted.

24. Months after the recall attempt failed, Defendant County, et al., on June 14, 2006, filed its civil complaint in *County of San Bernardino v. Jorge Mejia, et al.,* San Bernardino Superior Court Case No. SCVSS 138751 to restrain violations of County Code §87.0635.

25. On or about July 19, 2006, Defendant Superior Court granted a Preliminary Injunction pursuant to County Code §87.0635 restraining Plaintiffs from having trucks parked on their property in Case No. SCVSS 138751.

26. Plaintiffs' property is located in the unincorporated community of Bloomington, California, where the property was originally zoned as agricultural. It remained agricultural until about the 1990's when Defendant County rezoned it as residential. However, agricultural uses are still permitted

MOISES A. AVILES (226569)
AVILES & ASSOCIATES
560 N. Arrowhead Av., #2A
San Bernardino, CA., 92401
TEL.: (909) 383-2333
FAX: (909) 383-9550
maviles1231@aol.com

for Plaintiff's property.

27. Previously, in or about September 2002, when Plaintiffs bought the property, nobody warned them that truck parking was allowed on their property, nor did Defendant County or any of its agents and employees informed Plaintiffs and their neighbors that there was going to be any zone changes or any other changes to their property and that of their neighbors.

28. County Code §87.0635 is not a zoning ordinance, which prohibits the parking of trucks in "residential" lots. Defendant County cannot claim that parking of commercial trucks is prohibited, while the County Code itself allows some commercial trucks to be parked. The original ordinance was adopted in 2001. There was no guarantee that Plaintiffs received notice that §87.0635 was going to be adopted or amended.

29. County Code §87.0635 is unconstitutional under the case of *In re Scarpitti* (Cal. App. 4 Dist. 1981) 124 Cal. App. 3d 434, 439-441, 177 Cal. Rptr. 387, in that the ordinance is not reasonably certain and does not give common sense notice of the proscribed activity. Enforcement of §87.0635 is also prohibited on the basis that California Vehicle Code §§21, and 34623(a), and the case of *American Trucking Assocs. v. City of Los Angeles,* http://www.ca9.uscourts.gov/datastore/opinions/2009/03/20/0856503.pdf, at p. 3588, fn. 13, all state that the California Highway Patrol has exclusive "regulation of safety of operation of motor carriers of property." Since most commercial vehicles are "motor carriers of property", the County lacks jurisdiction over what streets or what properties these "motor carriers of property" may park on. Enforcement of §87.0635 is also discriminatory because Defendants are prosecuting the above civil suit, because of Plaintiffs' race, and that Plaintiffs engaged in the failed recall attempt of Defendant

Complaint for Violation of Civil Rights –Mejia v. County of San

Bernardino - 7

MOISES A. AVILES (226569)
AVILES & ASSOCIATES
560 N. Arrowhead Av., #2A
San Bernardino, CA., 92401
TEL.: (909) 383-2333
FAX: (909) 383-9550
maviles1231@aol.com

Gonzales, a County Supervisor. Enforcement of §87.0635 would also help cause traffic accidents on our streets and freeways as described in the University of California, Berkeley report, "Commercial Vehicle Parking in California: Exploratory Evaluation of the Problem and Possible Technology-Based Solutions", which is attached as Exhibit "A".

30. None of Plaintiffs' neighbors are prosecuted civilly or criminally for violation(s) of County Code §87.0635, only the Plaintiffs due to their race and that Plaintiffs engaged in the failed recall attempt of Defendant Gonzales, a County Supervisor. The threats to enforce the ordinances against Plaintiffs are not made with any expectation of securing valid injunctions, but rather are part of a plan to employ arrests, seizures, and threats of prosecution under color of the statutes to harass Plaintiffs and discourage them and their supporters from asserting and attempting to vindicate the constitutional rights of the people of Bloomington, California, against the redevelopment schemes of Defendant Gonzales, a County Supervisor.

31. On or about August 25, 2008, an Inspector from the Animal Control Department came and stated that Plaintiffs' cows need to be put in a built shade. After Plaintiffs put the cows in the built shade, Plaintiff Jorge Mejia was told to appear in the California Superior Court in Fontana, and plead "not guilty", and it would be dismissed. Instead, the District Attorney's Office filed a Misdemeanor Complaint against him in the case of *People of the State of California v. Jorge Alejo Mejia,* San Bernardino Superior Court Case No. MVA 803197.

32. On and between November 6 and 26, 2008, while Plaintiffs were incarcerated for violating the Preliminary Injunction, Deputy Sheriff DOES at the West Valley Detention Center kept Plaintiff Rosa Mejia cold without any blankets,

MOISES A. AVILES (226569)
AVILES & ASSOCIATES
560 N. Arrowhead Av., #2A
San Bernardino, CA., 92401
TEL.: (909) 383-2333
FAX: (909) 383-9550
maviles1231@aol.com

or medication for three days until she was getting sick.

33. In or about December 2008, County Fire Department Inspectors came over and inspected Plaintiffs' property. The following month, Defendant Iglesias wrote Plaintiffs a citation, and were told that Plaintiffs must have the address number posted and no smaller than four inches, must have a fire working permit, must have a hydro pump, and a land use permit.

34. On or about May 7, 2009, Defendants Deputy Sheriff DOES came barging into Plaintiffs' house with guns drawn, acting like Gestapo troops, but with a search warrant unsupported by probable cause, searched and ransacked Plaintiffs' house on the unsupported basis of California Penal Code §496(a) in violation of the Fourth Amendment. The Deputy Sheriff DOES also picked up papers that were not part of the warrant in violation of the Fourth Amendment, and one of said DOES said, "we got proof that you're running a trucking business, and we'll give this [Plaintiffs' papers] to Code Enforcement". Plaintiffs believe that private party DOES were instrumental in instigating the illegal search.

35. By reason of Defendants' conspiratorial conduct, said Plaintiffs were deprived of rights, privileges, and immunities secured to them by the Constitution of the United States and the Constitution and laws of the State of California in that said Plaintiffs were and are being deprived of their money, their use of their land, and their freedom in general. Defendants' conduct violates the due process and equal protection clauses of the United States Constitution and deprives said Plaintiffs of rights under color of State law in violation of 42 U. S. C., §1983.

///

///

MOISES A. AVILES (226569)
AVILES & ASSOCIATES
560 N. Arrowhead Av., #2A
San Bernardino, CA., 92401
TEL.: (909) 383-2333
FAX: (909) 383-9550
maviles1231@aol.com

36. As a direct and proximate result of the wrongful acts of Defendants, said Plaintiffs were damaged. Said Plaintiffs have been almost totally deprived of their ownership rights to their money, their use of their land, and their freedom in general, and have and will have suffered humiliation, anxiety, and emotional and physical distress that will continue on into the future, unless the Court intervenes.

37. Said Plaintiffs further seek compensatory damages for the humiliation, anxiety, physical distress, including the fact that Plaintiff Jorge Mejia lost his Commercial Driver's License because he suffered from high blood pressure, because of all of the Defendants' harassment, that they have suffered as a direct result of Defendants' wrongful acts as described herein, plus attorney's fees and costs.

38. The above recited acts of the individual Defendants in conspiring to deprive said Plaintiffs of their constitutionally protected rights were done with evil motive or intent, or with reckless or callous indifference to said Plaintiffs' rights. Said Plaintiffs therefore seek punitive, exemplary, and constitutional damages in an amount according to proof against the Defendants.

39. No adequate remedy exists at law for the injuries suffered or that would be suffered by said Plaintiffs herein, insofar as the civil prosecution of Case No. SCVSS 138751 and the criminal prosecution of MVA 803197 absent injunctive relief. If this Court does not grant injunctive relief of the type and for the purpose specified below, said Plaintiffs would suffer irreparable injury, and lose their money, their use of their land, and their freedom in general. Therefore, said Plaintiffs request the following declaratory and injunctive relief: that Defendants be restrained from proceeding in San Bernardino Superior Court Case Nos. SCVSS 138751 and MVA 803197 in any way.

Complaint for Violation of Civil Rights –Mejia v. County of San Bernardino - 10

MOISES A. AVILES (226569)
AVILES & ASSOCIATES
560 N. Arrowhead Av., #2A
San Bernardino, CA., 92401
TEL.: (909) 383-2333
FAX: (909) 383-9550
maviles1231@aol.com

Failure to do so will cause irreparable harm to Plaintiffs.

40.  Defendants have already obtained the desired result f incarcerating Plaintiffs and now have obtained an order for a receivership of Plaintiffs property thereby depriving Plaintiffs of every constitutional guarantee.

41. Unless this Court restraints the civil matter SCVSSS 138751 and stays the order of receivership to further prevent irreparable harm, Plaintiffs will be left with no adequate remedy at law and a total divestiture of their civil and constitutional rights will have occurred.

**II. SECOND CAUSE OF ACTION BROUGHT BY PLAINTIFFS AGAINST ALL DEFENDANTS FOR CONSPIRACY TO VIOLATE CIVIL RIGHTS.**

42. Plaintiffs incorporate by this reference Paragraphs 1 through 41 of the First Cause of Action as though they were set forth in full herein.

43. At all times hereinafter mentioned, each and all of the acts of the Defendants alleged herein were done by the Defendants under the color and pretense of the statutes, regulations, customs and usages of the State and under the authority of their offices as heretofore alleged herein.

44. Plaintiffs, who are Latinos, were deprived of an interest protected by the Constitution and/or laws of the United States of America, and each and every Defendant caused, by commission or omission, such deprivation while acting under color of law.

45. All acts and/or omissions perpetrated by each Defendant were engaged in maliciously, callously, oppressively, wantonly, recklessly, with deliberate indifference to the rights already violated, despicably, with evil motive and/or intent, in disregard of the rights of the Plaintiffs.

///

///

Complaint for Violation of Civil Rights –Mejia v. County of San

Bernardino - 11

MOISES A. AVILES (226569)
AVILES & ASSOCIATES
560 N. Arrowhead Av., #2A
San Bernardino, CA., 92401
TEL.: (909) 383-2333
FAX: (909) 383-9550
maviles1231@aol.com

46. Defendant County and any Defendant in his/her official and/or individual capacity knowingly, or grossly negligently, or with deliberate indifference to the rights allegedly violated, conspired to cause to come into being, maintained, fostered, condoned, approved of, either before the fact or after the fact, ratified, took no action to correct, an official policy, practice, procedure, or custom of permitting the occurrence of the categories of wrongs set forth in this pleading, and/or improperly, inadequately, with deliberate indifference to the constitutional or other federal rights of persons, grossly negligently, with reckless disregard to constitutional or other federal rights, conspired to violate civil rights, so that each one of them is legally responsible for all of the injuries and/or damages sustained by the Plaintiffs pursuant to the principles set forth in *Monell v. New York City Dept. of Social Services* and its progeny. Furthermore, the actions of Defendant County, each follow a policy of "no policy" in protecting the rights of property owners, and that the individual Defendants have demonstrated a lack of training and guidance in the protecting of the constitutional and civil rights regarding the protection of property owners.

47. In or about 2002, Plaintiffs bought their property from Mr. Rodriguez, the previous owner. Mr. Rodriguez also used the property as a trucking business, which also had a fuel pump.

48. In or about 2005, both Plaintiffs participated as proponents and in collecting signatures to have Defendant Gonzales face a recall election. Plaintiffs and other proponents of the Recall Petition objected to Gonzales' attempts to have the unincorporated communities of Bloomington and Muscoy redeveloped causing many businesses to be condemned for private uses, such as shopping centers, and condominiums.

MOISES A. AVILES (226569)
AVILES & ASSOCIATES
560 N. Arrowhead Av., #2A
San Bernardino, CA., 92401
TEL.: (909) 383-2333
FAX: (909) 383-9550
maviles1231@aol.com

49. After Plaintiffs and other recall proponents did not obtain enough signatures, Defendants County, and the Office of County Counsel, who is not authorized under West's Government Code §§26528 and 26529 targeted Plaintiffs and a few others by citing them for allowing them to park trucks on their private property. The County also does not allow trucks to be parked on the street, even though that is rarely enforced.

50. Months after the recall attempt failed, Defendant County, et al., on June 14, 2006, filed its civil complaint in *County of San Bernardino v. Jorge Mejia, et al.,* San Bernardino Superior Court Case No. SCVSS 138751 to restrain violations of County Code §87.0635.

51. On or about July 19, 2006, Defendant Superior Court granted a Preliminary Injunction pursuant to County Code §87.0635 restraining Plaintiffs from having trucks parked on their property in Case No. SCVSS 138751.

52. Plaintiffs' property is located in the unincorporated community of Bloomington, California, where the property was originally zoned as agricultural. It remained agricultural until about the 1990's when Defendant County rezoned it as residential. However, agricultural uses are still permitted for Plaintiff's property.

53. Previously, in or about September 2002, when Plaintiffs bought the property, nobody warned them that truck parking was allowed on their property, nor did Defendant County or any of its agents and employees informed Plaintiffs and their neighbors that there was going to be any zone changes or any other changes to their property and that of their neighbors.

54. County Code §87.0635 is not a zoning ordinance, which prohibits the parking of trucks in "residential" lots. Defendant County cannot claim that parking of commercial trucks is prohibited, while the County Code itself allows some

MOISES A. AVILES (226569)
AVILES & ASSOCIATES
560 N. Arrowhead Av., #2A
San Bernardino, CA., 92401
TEL.: (909) 383-2333
FAX: (909) 383-9550
maviles1231@aol.com

commercial trucks to be parked. The original ordinance was adopted in 2001. There was no guarantee that Plaintiffs received notice that §87.0635 was going to be adopted or amended.

55. County Code §87.0635 is unconstitutional under the case of *In re Scarpitti* (Cal. App. 4 Dist. 1981) 124 Cal. App. 3d 434, 439-441, 177 Cal. Rptr. 387, in that the ordinance is not reasonably certain and does not give common sense notice of the proscribed activity. Enforcement of §87.0635 is also prohibited on the basis that California Vehicle Code §§21, and 34623(a), and the case of *American Trucking Assocs. v. City of Los Angeles,* http://www.ca9.uscourts.gov/datastore/opinions/2009/03/20/0856503.pdf, at p. 3588, fn. 13, all state that the California Highway Patrol has exclusive "regulation of safety of operation of motor carriers of property." Since most commercial vehicles are "motor carriers of property", the County lacks jurisdiction over what streets or what properties these "motor carriers of property" may park on. Enforcement of §87.0635 is also discriminatory because Defendants are prosecuting the above civil suit, because of Plaintiffs' race, and that Plaintiffs engaged in the failed recall attempt of Defendant Gonzales, a County Supervisor. Enforcement of §87.0635 would also help cause traffic accidents on our streets and freeways as described in the University of California, Berkeley report, "Commercial Vehicle Parking in California: Exploratory Evaluation of the Problem and Possible Technology-Based Solutions", which is attached as Exhibit "A".

56. None of Plaintiffs' neighbors are prosecuted civilly or criminally for violation(s) of County Code §87.0635, only the Plaintiffs due to their race and that Plaintiffs engaged in the failed recall attempt of Defendant Gonzales, a County Supervisor. The threats to enforce the ordinances against Plaintiffs are

Complaint for Violation of Civil Rights –Mejia v. County of San

Bernardino - 14

MOISES A. AVILES (226569)
AVILES & ASSOCIATES
560 N. Arrowhead Av., #2A
San Bernardino, CA., 92401
TEL.: (909) 383-2333
FAX: (909) 383-9550
maviles1231@aol.com

not made with any expectation of securing valid injunctions, but rather are part of a plan to employ arrests, seizures, and threats of prosecution under color of the statutes to harass Plaintiffs and discourage them and their supporters from asserting and attempting to vindicate the constitutional rights of the people of Bloomington, California, against the redevelopment schemes of Defendant Gonzales, a County Supervisor.

57. On or about August 25, 2008, an Inspector from the Animal Control Department came and stated that Plaintiffs' cows need to be put in a built shade. After Plaintiffs put the cows in the built shade, Plaintiff Jorge Mejia was told to appear in the California Superior Court in Fontana, and plead "not guilty", and it would be dismissed. Instead, the District Attorney's Office filed a Misdemeanor Complaint against him in the case of *People of the State of California v. Jorge Alejo Mejia,* San Bernardino Superior Court Case No. MVA 803197.

58. On and between November 6 and 26, 2008, while Plaintiffs were incarcerated for violating the Preliminary Injunction, Deputy Sheriff DOES at the West Valley Detention Center kept Plaintiff Rosa Mejia cold without any blankets, or medication for three days until she was getting sick.

59. In or about December 2008, County Fire Department Inspectors came over and inspected Plaintiffs' property. The following month, Defendant Iglesias wrote Plaintiffs a citation, and were told that Plaintiffs must have the address number posted and no smaller than four inches, must have a fire working permit, must have a hydro pump, and a land use permit.

60. On or about May 7, 2009, Defendants Deputy Sheriff DOES came barging into Plaintiffs' house with guns drawn, acting like Gestapo troops, but with a search warrant unsupported by probable cause, searched and ransacked

Complaint for Violation of Civil Rights –Mejia v. County of San Bernardino - 15

MOISES A. AVILES (226569)
AVILES & ASSOCIATES
560 N. Arrowhead Av., #2A
San Bernardino, CA., 92401
TEL.: (909) 383-2333
FAX: (909) 383-9550
maviles1231@aol.com

Plaintiffs' house on the unsupported basis of California Penal Code §496(a) in violation of the Fourth Amendment. The Deputy Sheriff DOES also picked up papers that were not part of the warrant in violation of the Fourth Amendment, and one of said DOES said, "we got proof that you're running a trucking business, and we'll give this [Plaintiffs' papers] to Code Enforcement". Plaintiffs believe that private party DOES were instrumental in instigating the illegal search.

61. By reason of Defendants' conspiratorial conduct, said Plaintiffs were deprived of rights, privileges, and immunities secured to them by the Constitution of the United States and the Constitution and laws of the State of California in that said Plaintiffs were and are being deprived of their money, their use of their land, and their freedom in general. Defendants' conduct violates the due process and equal protection clauses of the United States Constitution and deprives said Plaintiffs of rights under color of State law in violation of 42 U. S. C., §1985(3).

62. There was an agreement or understanding between or among Defendants and some of the Defendants in the instant case to engage in the conduct alleged herein to be wrongful, and there was the commission of an overt act of criminal conduct in furtherance of said conspiracy.

63. As a direct and proximate result of the wrongful acts of Defendants, said Plaintiffs were damaged. Said Plaintiffs have been almost totally deprived of their ownership rights to their money, their use of their land, and their freedom in general, and have and will have suffered humiliation, anxiety, and emotional and physical distress that will continue on into the future, unless the Court intervenes.

///

MOISES A. AVILES (226569)
AVILES & ASSOCIATES
560 N. Arrowhead Av., #2A
San Bernardino, CA., 92401
TEL.: (909) 383-2333
FAX: (909) 383-9550
maviles1231@aol.com

64  Said Plaintiffs further seek compensatory damages for the humiliation, anxiety, physical distress including the fact that Plaintiff Jorge Mejia lost his Commercial Driver's License because he suffered from high blood pressure, because of all of the Defendants' harassment, that they have suffered as a direct result of Defendants' wrongful acts as described herein, plus attorney's fees and costs.

65. The above recited acts of the individual Defendants in conspiring to deprive said Plaintiffs of their constitutionally protected rights were done with evil motive or intent, or with reckless or callous indifference to said Plaintiffs' rights. Said Plaintiffs therefore seek punitive, exemplary, and constitutional damages in an amount according to proof against the Defendants.

66. No adequate remedy exists at law for the injuries suffered or that would be suffered by said Plaintiffs herein, insofar as the civil prosecution of Case No. SCVSS 138751 and the criminal prosecution of MVA 803197 absent injunctive relief. If this Court does not grant injunctive relief of the type and for the purpose specified below, said Plaintiffs would suffer irreparable injury, and lose their money, their use of their land, and their freedom in general. Therefore, said Plaintiffs request the following declaratory and injunctive relief: that Defendants be restrained from proceeding in San Bernardino Superior Court Case Nos. SCVSS 138751 and MVA 803197 in any way. Failure to do so will cause irreparable harm to Plaintiffs.

WHEREFORE, Plaintiffs pray for:

1.  For general damages according to proof;

2.  For interest at the legal rate according to proof;

3.  For punitive damages in the amount according to proof;

Complaint for Violation of Civil Rights –Mejia v. County of San

Bernardino - 17

MOISES A. AVILES (226569)
AVILES & ASSOCIATES
560 N. Arrowhead Av., #2A
San Bernardino, CA., 92401
TEL.: (909) 383-2333
FAX: (909) 383-9550
maviles1231@aol.com

4. For declaratory and injunctive relief as requested in Paragraphs 39 and 67 above;

5. For reasonable attorney's fees pursuant to 42 U. S. C., §1988;

6. That Plaintiff be awarded his costs of suit herein, including reasonable attorneys fees; and

7. For such other and further relief as the court may deem just and proper.

Dated this 24th day of July, 2009

By: L. MOISES A. AVILES
(226569)
AVILES & ASSOCIATES
560 N. Arrowhead Av.,
#2A
San Bernardino, CA.,
92401
TEL.: (909) 383-2333
FAX: (909) 383-9550
maviles1231@aol.com
Attorney for Plaintiffs
JORGE MEJIA and ROSA
MEJIA

///
///
///
///
///
///
///
///

Complaint for Violation of Civil Rights –Mejia v. County of San

Bernardino - 18

MOISES A. AVILES (226569)
AVILES & ASSOCIATES
560 N. Arrowhead Av., #2A
San Bernardino, CA., 92401
TEL.: (909) 383-2333
FAX: (909) 383-9550
maviles1231@aol.com

**DEMAND FOR JURY TRIAL.**

Plaintiffs demand a jury trial pursuant to the Seventh Amendment of the Constitution of the United States of America, and Federal Rule of Civil Procedure 38.

Dated this 24th day of July, 2009

By:_____

MOISES A. AVILES
(226569)
AVILES & ASSOCIATES
560 N. Arrowhead Av.,
#2A
San Bernardino, CA.,
92401
TEL.: (909) 383-2333
FAX: (909) 383-9550
maviles1231@aol.com
Attorney for Plaintiffs
JORGE MEJIA and ROSA
MEJIA

**VERIFICATION.**

I, Jorge Mejia, declare that:

I am the Plaintiff in the above-entitled Complaint. I have read the foregoing Complaint and know the contents thereof. The same is true of my own knowledge, except as to matters therein stated on information and belief, and as to those matters, I believe it to be true.

Under the penalty of perjury, I declare that the foregoing is true and correct, and that this declaration was executed on July _____, 2009, at San Bernardino, California.

_____

JORGE MEJIA,
Plaintiff.

Complaint for Violation of Civil Rights –Mejia v. County of San

Bernardino - 19

MOISES A. AVILES (226569)
AVILES & ASSOCIATES
560 N. Arrowhead Av., #2A
San Bernardino, CA., 92401
TEL.: (909) 383-2333
FAX: (909) 383-9550
maviles1231@aol.com

# COMMERCIAL VEHICLE PARKING IN CALIFORNIA: EXPLORATORY EVALUATION OF THE PROBLEM AND POSSIBLE TECHNOLOGY-BASED SOLUTIONS

Caroline J. Rodier, Ph.D.[1] and Susan A. Shaheen, Ph.D.[2]

1. Assistant Researcher Engineer, Transportation Sustainability Research Center, University of California, Berkeley; 1357 S. 46th Street. Bldg 190; Richmond, CA 94804-4648; 916-451-8088 (O); 916-451-8188 (F);                    (Corresponding Author)

2. Research Director, Transportation Sustainability Research Center, University of California, Berkeley; 1357 S. 46th Street. Bldg 190; Richmond, CA 94804-4648; 510-665-3483 (O)

July 27, 2007

**KEY WORDS: commercial vehicle travel, truck parking, ITS**

**Word Count: 5486**

**Submitted to the 2008 Transportation Research Board Annual Meeting**

EXHIBIT "A"
-19-

Rodier and Shaheen                                                                1

## ABSTRACT

The United States is experiencing dramatic growth in commercial vehicle truck travel on our nation's roadway system as well as critical shortages in truck parking. California ranks first in the nation in overall (private and public) commercial vehicle parking shortage. Recent estimates of the demand for truck parking in California indicate that demand exceeds capacity at all public rest areas; this is the case at 88 percent of private truck stops on the 34 corridors in California with the highest truck travel volumes. Nationwide, shortages of public truck spaces, however, are considered to be more severe than shortages of private spaces. In 2002, 71 percent of states reported public shortages, but only 16 percent report private shortages. The truck parking shortage in California and the U.S. has a number of serious consequences that threaten our roadway safety, public health, and economic productivity. This study begins with a literature review of the commercial vehicle truck parking problems in California and the United States, available evidence on truck drivers' parking preferences, and a description and evaluation of current and future approaches to the truck parking problem. Next, the results of a statewide trucker survey conducted in 2006, which included questions related to truck parking information services—a promising solution to the truck parking problem suggested in the literature—are presented. The study concludes by summarizing key findings.

Rodier and Shaheen

## INTRODUCTION

The United States is experiencing dramatic growth in commercial vehicle truck travel on our nation's roadway system as well as critical shortages in truck parking. California ranks first in the nation in overall (private and public) commercial vehicle parking shortage (1). Recent estimates of the demand for truck parking in California indicate that demand exceeds capacity at all public rest areas; this is the case at 88 percent of private truck stops on the 34 corridors in California with the highest truck travel volumes (2). Nationwide, shortages of public truck spaces, however, are considered to be more severe than shortages of private spaces. In 2002, 71 percent of states reported public shortages, but only 16 percent report private shortages (3). The truck parking shortage in California and the U.S. has a number of serious consequences that threaten our roadway safety, public health, and economic productivity.

This study begins with a literature review of the commercial vehicle truck parking problems in California and the United States, available evidence on truck drivers' parking preferences, and a description and evaluation of current and future approaches to the truck parking problem. Next, the results of a statewide trucker survey conducted in 2006, which included questions related to truck parking information services—a promising solution to the truck parking problem suggested in the literature—are presented. The study concludes by summarizing key findings.

## BACKGROUND

Public rest areas were built along Interstate Highways as part of the federal-aid highway program and are maintained by state Departments of Transportation (DOT). These spaces were built to accommodate the physically smaller trucks on the highways in the mid-20th century. As the trucking industry has evolved and truck sizes have increased dramatically, space availability has decreased as trucks may occupy multiple spaces. Private truck stops gained momentum during the building of the Interstate Highway system and the National Association of Truck Stop Operators (NATSO) was formed in 1960 (4). Private truck stops offer more parking spaces and amenities than public rest areas. Public rest areas are generally located along major highways, and private truck stops are typically located near, but not adjacent to highway facilities.

The Federal Hours-of-Service (HOS) regulations, originally instituted in 1937, have contributed to the demand for both private and public truck parking. These regulations mandate the number of hours a truck driver can operate a commercial vehicle before taking a rest. The rules prior to the 2003 change allowed a driver to drive a maximum of 10 hours after 8 consecutive hours off duty, which was changed in 2003 to 11 hours after 10 consecutive hours off duty. Another 2003 change included not allowing an operator to drive beyond the 14th hour after coming on duty, following 10 consecutive hours off duty; this was changed from allowing 15 hours after coming on duty, following 8 consecutive hours off duty.

Congressional mandates related to truck parking studies began with the National Transportation Safety Board (NTSB) (5) estimate that 31 percent of fatal truck collisions and crashes were fatigue-related and analysis that a major contributor to fatigue was the lack of safe and available truck parking on or near Interstate highways. In 2000, with help from the NTSB, Congress recommended the Federal Motor Carrier Safety Administration (FMCSA) create a guide to inform truck drivers of the locations of parking and parking availability. Congress continued to place importance on truck parking through the Transportation Equity Act for the

Case 2:09-cv-05476-SVW-FFM   Document 1   Filed 07/27/09   Page 23 of 36   Page ID #:23

21st Century (TEA-21), setting aside funding to investigate the adequacy of truck parking and rest areas. Section 4027 of TEA-21 mandated a study to determine the location and quantity of parking facilities at both commercial truck stops and public rest areas. This study inventoried the current facilities and examined shortages.

Safe, Accountable Flexible Efficient Transportation Equity Act: A Legacy for Users (SAFETEA-LU), Section 1305 further emphasized the importance of investigating truck parking availability. SAFETEA-LU authorizes $6.25 million for the four years starting in 2006 to establish the Truck Parking Facilities Pilot Program. This program provides funding to address the shortage of long-term parking for commercial vehicles on the National Highway System. The funds are available for projects that both improve current operational facilities (improving facility access and reconfiguring parking spaces to accommodate truck maneuvers) and increasing the number of facilities (constructing new facilities and utilizing parking available at other facilities). SAFETEA-LU emphasizes the importance of highway safety, congestion reduction, and air quality improvements by giving priority to projects that will address these issues (6).

SAFETEA-LU further supports improvements to current rest areas by identifying two new programs that address the problem of idling emission issues and the truck parking shortage. The Interstate Oasis Program and Idling Reduction Facilities on Interstate Rights-of-Way Program are designed to establish standards for rest facilities along the Interstate system and to encourage decreasing emission levels from idling trucks. The goal of the Interstate Oasis Program is to establish service standards for designating certain facilities near the Interstate System as "Interstate Oases." These areas must offer products and services to the public, provide 24-hour access to restrooms, supply parking for heavy trucks and automobiles, and have a clean appearance with accessibility to the Interstate system. The goal of the Idling Reduction Facilities in Interstate Rights-of-Way Program is to provide facilities that allow commercial vehicle operators to reduce truck idling or provide alternative power to support driver comfort while parked in a public rest area (6).

## TRUCK PARKING SHORTAGES

### Nationwide

The United States is experiencing dramatic growth in commercial vehicle truck travel on our nation's roadway system. Tight "just-in-time" commercial vehicle delivery schedules and hours-of-service rules have contributed to significant nationwide shortages in truck parking spaces (7). Shortages of public truck spaces, however, are considered to be more severe than shortages of private spaces. In 2002, 71 percent of states reported public shortages, but only 16 percent reported private shortages (3). This trend is expected to continue: the annual demand for public rest area spaces is projected to be 1.7 percent greater than the growth in supply, while the annual increase in private spaces is expected to exceed demand (1).

### California and Contiguous States

California ranks first in the nation in overall (private and public) commercial vehicle parking shortage (1). Recent truck parking demand estimates in California indicate that demand exceeds capacity at all public rest areas and at 88 percent of private truck stops on the 34 corridors in

Rodier and Shaheen                                                    4

California with the highest volumes of truck travel (2). Table 1 provides an overview of supply and demand for truck parking based on the results of surveys and demand estimates conducted by Caltrans and the United States DOT. The California Highway Patrol has identified 198 illegal truck parking locations, most of which are around existing public rest areas and private truck stops (2). Moreover, it is estimated that by the year 2020 average daily truck travel will increase by approximately 50 percent; the demand for public rest area parking will increase by 53 percent, and demand for private parking will increase by 100 percent (2).

**TABLE 1 Overview of the Supply and Demand for Truck Parking in California (1, 2).**

| Attribute | Public Rest Area | Private Truck Stop | Other Private Location | Illegal Parking Locations |
|---|---|---|---|---|
| Ownership | Public | Private | Private | Public |
| Legal Parking Time | Typically, a few hours | Unlimited | Unlimited | Zero (illegal to park) |
| Number of Facilities | 88 | 33 | Unknown | 198[1] |
| Spaces per Location | Maximum: 205 Minimum: 0 Average: 85 | Maximum: 420 Minimum: 0 Average: 53 | Unknown | Undefined |
| Number of Spaces Overall | 7,496 | 1,106 | Unknown | Undefined |
| Space Shortage as of 2000 | 8,057 | 6,106 | Unknown | Undefined |
| Location Convenience | High | Moderate | Varies | High |
| Parking Convenience | Varies | Varies | Varies | High |
| Safety from Crime | Varies | Varies | Perceived as Moderate to Low[2] | Varies |
| Safety from Crashes | Safe | Safe | Safe | Not as safe |

[1] Based on California Highway Patrol's observations of unauthorized parking locations.
[2] Federal Highway Administration, 2002b.

States that are contiguous to California have a shortage in public rest areas but a surplus of private truck stops (see Table 2). To summarize, parking capacity exists in private truck stops in California and contiguous states. Thus, there is potential to better manage use of existing spaces through availability and guidance information, as well as reservations.

Rodier and Shaheen

5

**TABLE 2 Demand/Supply Ratio of States Contiguous to California.[1]**

| State | Public | Private | Overall |
|-------|--------|---------|---------|
| Nevada | 2.62 | 0.46 | 0.57 |
| Oregon | 1.89 | 0.67 | 0.79 |
| Arizona | 1.88 | 0.43 | 0.53 |
| Utah | 1.64 | 0.54 | 0.62 |

[1] Fleger et al., 2006

## THE CONSEQUENCES OF TRUCK PARKING SHORTAGE

### Illegal Truck Parking

Not surprisingly, nationwide incidences of illegal truck parking have increased with the shortage of commercial vehicle parking. A recent survey of states indicates that 17 have observed illegal truck parking at freeway interchange ramps, 14 at freeway interchanges ramps, eight on conventional highway roadsides, and eight on local streets near freeways. Illegal truck parking is dangerous: "(1) it limits the ability of parked vehicles to accelerate safely into the traffic stream from their parked position; (2) the presence of parked vehicles creates a conflict between existing and parked vehicles; and (3) errant vehicles may stray into the shoulder area and strike parked vehicles" (7, p. 3).

### Roadway Safety

All too often, the only alternative to truck drivers parking illegally is to continue driving while fatigued. Fatigue is a major contributing factor to truck collisions: eight percent of all fatal collisions and 16 percent of all truck collisions (8). The inability of drivers to find public or private truck parking may contribute to the fatigue that causes these crashes.

### Air Quality

Diesel emissions from trucks contribute significantly to air pollution and are known to lead to severe health damage. Out of the top metropolitan areas in the U.S. with the greatest health impacts due to diesel, four are in California: Los Angeles, San Francisco-Oakland-Fremont, San Diego-Carlsbad-San Marcos, and Riverside-San Bernardino-Ontario, ranking second, seventh, 21st, and 25th respectively (9, 10). Navigational waste due to a trucker's search for parking, illegal truck traffic, and parking on neighborhood streets can contribute unnecessarily to poor air quality and adverse health effects. For example, children living in West Oakland, California, where illegal truck traffic and parking is common, have a seven-fold higher likelihood of hospitalization due to asthma than an average child living in California (11).

### Trucking Industry

The shortage of truck parking spaces also has a number of negative consequences to the trucking industry (12). First, illegal parking and driving while fatigued can result in significant liability in a crash. Second, driver productivity is lower due to the time and money lost searching for

Rodier and Shaheen                                                                    6

parking. Third, "the poor choices given to drivers (parking illegally or driving while fatigued) may lead to increased job dissatisfaction; this is an industry with high driver turnover" (12, p.2).

## LESSONS LEARNED FROM RECENT TRUCK DRIVER SURVEYS

The characteristics of truckers, truck parking behavior, and parking needs are explored in two relatively recent surveys. The first is the nationwide survey of 2,000 truck drivers sponsored by the Federal Highway Administration (FHWA) (3). The second is a smaller survey of 338 truckers at six Travel Centers of America private truck stops (13), conducted to explore truck parking and idling-related issues.

### Parking Locations

The results of both surveys indicate that private truck stops are preferred for long-term rests and that a sizeable number of truckers regularly park in unauthorized areas. According to the FHWA (3) survey, 90 percent park in private truck stops for long-term rest (four times a week on average); 67 percent use rest areas (two times a week on average); and 67 percent park in illegal spaces for long-term parking (two times a week on average), including entrance or exit ramps (33 percent), other parking lots (21 percent), and highway shoulders (11 percent). According to the Lutsey et al. survey (13), 90 percent of respondents had used a truck stop for at least one overnight rest, 53 percent had used a public rest area, and 25 percent parked in an unauthorized location.

### Parking Decisions

Results of both surveys indicate that truck drivers (not their carrier) decide where they will park—98 percent according to the FHWA survey (3) and 84 percent according to the Lutsey et al. survey (13). Truck drivers' parking decision making can be conceptualized as follows: "(1) 12 to 24 hours in advance; (2) an hour or so prior to a planned rest, typically within a 100-mile radius; and (3) at the end of the day, a driver decides whether or not to pull off when approaching a rest area" (12, pp. 10, 11).

Among those drivers who make their own parking decisions, 21 percent do so before they start driving and 83 percent decide en-route (3). Among those who park illegally and make their own parking decisions (97 percent), 89 percent decide en-route and 16 percent do before driving (3). The FHWA survey (3) found that: (1) owners and leasers are more likely to plan their own parking than company drivers; (2) company drivers are more likely than owners and leasers to select truck stops before they start driving; and (3) owners and leasers are more likely to decide where to park en-route (3).

Approximately 300 respondents to the FHWA survey (3) provided additional comments. These are summarized as follows, drivers: "(1) often try to plan their parking stops but circumstances arise that prevent them from parking when or where they had planned; (2) frequently become tired before they thought they would, experience delays at shippers/receiver locations, and fail to find available parking spaces at their pre-planned destinations; (3) decide where to park as their on-duty hours elapse based on how far they think they can drive in the remaining hours of service; and (4) often do not plan ahead but simply park whenever they find an available space" (3, p. 13).

Rodier and Shaheen                                                                    7

## Illegal Parking

The FHWA (3) and Lutsey et al. (13) surveys found that a sizable percent of respondents do park in unauthorized parking locations (97 and 25 percent, respectively). The FHWA survey (13) found that the two top reasons cited by trucker for parking illegally were: (1) no empty spaces at nearby facilities (94 percent of respondents) and (2) no nearby parking facilities (83 percent of respondents). In many instances, these responses may reflect lack of knowledge about available parking rather than actual knowledge. For example, interviews conducted with truck drivers in unauthorized spaces by the Maryland State Police in 2004 indicate that many drivers park illegally because they are unsure of the nearest authorized parking area, and trucks were parked illegally very near facilities with available parking capacity (6). Moreover, "almost 40 percent of drivers who park in these unconventional locations indicated that alternative parking, if made available, would improve the parking situation" (3, p. 12). The FHWA study concludes that: "there may be some connection between poor planning and parking on shoulders and ramps" (3, p. 15).

## Parking Needs and Preferences

According to the FHWA study, most drivers indicate that more truck parking is needed during overnight hours, near metropolitan areas, and in specific regions: the northeast, the northwest, and Southern California (3). In general, drivers indicate that important attributes of long-term rest locations are food, fuel, restrooms, phones, showers, nearby highway, well-lighted parking lots, and security (3). Drivers also commented that "big parking spaces that allow trucks to maneuver in and out" were important attributes of truck parking locations (3, p.15).

## LESSONS LEARNED FROM PARKING GUIDANCE INFORMATION FOR AUTOS

Smart parking management systems for automobiles have been implemented throughout Europe, the United Kingdom, and Japan since the early 1970s and provide information on available parking locations. Parking guidance information (PGI) systems, and more recently, transit-based smart parking systems, provide real-time information to motorists regarding available parking spaces and locations. Lessons learned by evaluating and modeling these systems suggest that awareness and understanding can be relatively high, but that people who are less familiar with the area (i.e., visitors rather than commuters) tend to be the most frequent users (14). Truckers, however, may be more like visitors and use en-route parking information more frequently because they often cannot or do not plan their parking in advance and/or lack parking information knowledge due to high driver turnover. PGI systems also tend to reduce parking facility queue lengths and provide modest system-wide reductions in travel time and vehicle travel (14). Recommendations to improve these systems include: (1) targeting messages to the information needs, decision points, and knowledge levels of market segments early on in the system development process; (2) making messages conspicuous and providing some reinforcement; and (3) providing messages that are consistently credible (14).

Case 2:09-cv-05476-SVW-FFM   Document 1   Filed 07/27/09   Page 28 of 36   Page ID #:28

## SOLUTIONS

The alternatives available to address the truck parking shortage problem generally include increasing the supply of spaces and better matching supply and demand. In general, the literature suggests that the latter is the most practical and cost-effective, near-term solution, particularly in metropolitan areas where land prices are high. Moreover, as new parking supply becomes available, technologies that better match supply and demand can continue to maximize the effectiveness of new truck parking investments. Some opportunities for expanding supply where land prices are high include allowing overnight parking at park-and-ride lots and weigh stations.

### Truck Driver Recommendations

Improving truck parking information and methods of communicating this information were explored in the FHWA survey (*3*). Seventy-three percent of respondents indicated that they would like to receive information by the radio in their vehicle; 40 percent preferred to use their vehicle's electronic visual display; and 12 percent preferred the Internet (*3*). Respondents also indicated a desire for the following real-time information: "(1) location of truck parking facilities along the road being traveled (84 percent); (2) features (e.g., showers, hot meals) that are available at upcoming parking facilities (77 percent); (3) number of truck parking spaces available at upcoming parking facilities (6 percent); and (4) length of time limits on upcoming truck parking spaces (46 percent)" (*3*, p. 19). From the over 200 written comments, respondents also expressed interest in obtaining information about: "(1) the layout and size of parking spaces at upcoming facilities and (2) whether a parking facility can accommodate trucks that are oversized, hauling hazardous materials, or multiple–trailer loads" (*3*).

### Recommendations from Highway Maintenance Engineers in 49 States

The National Cooperative Highway Research Program (NCHRP) surveyed highway maintenance engineers from 49 states to identify effective and feasible solutions to truck parking problems (Trombly, 2003). Using "ITS to expand the amount of information available to truckers" ranked first (among a list of improvements including building new rest areas and truck stops) when evaluated against *effectiveness and feasibility* criteria (*7*, p. 17). Moreover, it was reported that "…the responses reflect a belief among agencies that the most effective and feasible way to reduce shortages is to make better use of existing resources, combined with a prudent expansion of existing public spaces. Because all the respondents work in the public sector, it can be speculated that their responses reflect recognition that a public role is appropriate—but the resources to meet all needs are not available, and that the private sector is in a better position to provide these resources" (*7*, p. 17). Two specific recommendations made by the states include: (1) developing ITS deployments that provide drivers with real-time information on the location and availability of parking spaces (for example, investigating the use of mobile phones and radio frequencies to broadcast parking locations and availability to drivers); and (2) distributing a "truckers' map" that pinpoints parking facilities for drivers (*7*, p. 19).

## National Transportation Safety Board Recommendations

The National Transportation Safety Board published a special report on truck parking-related problems in May 2000. The following are the major conclusions:

- While guides and mapping programs may list the private truck stops and public rest areas, they are not all-inclusive of available truck parking, such as alternative locations like park-and-ride lots and weigh stations. Also, the Safety Board concludes that some truck drivers do not have enough information on parking locations and need access to all available parking in advance and during trips.
- In many large trucking companies, trucks are equipped with global positioning systems (GPS) that enable dispatchers to tell drivers where to pick up a load, drop off, and get fuel, based on the truck's precise location. GPS, combined with electronic guidance, could enable dispatchers to notify truck drivers of the nearest parking facility (*5*, p. 23).

## TRUCK SURVEY AND DATA ANALYSIS

As described in the previous section, the analysis of the available literature suggests that the provision of parking information-related services may be a promising near-term solution to the truck parking problem. As a result, the authors worked with researchers at the University of California at Davis (Drs. Nicholas Lutsey and Christie-Joy Brodrick) to include questions related to truck parking information services in a statewide survey of truckers conducted for the California Air Resources Board. Figure 1 documents the survey instrument, and Figure 2 indicates the location where truckers were surveyed during the summer and fall of 2006. In total, 433 surveys were collected through in-person administration at various locations throughout the state.

Rodier and Shaheen                                                                                           10

---

**UC-Davis Truck Survey**

*(for staff use only)*    Date: _____    Time: _____ AM / PM    ID: _____
Location: _____    Route: _____    Direction: _____

1.) Vehicle type *(check)*:  ☐ Single Unit  ☐ Single Unit w/trailer  ☐ Single-Trailer  ☐ Multiple-Trailer  ☐ Tractor    No. axles: ☐

2.) What is the Gross Vehicle Weight (GVW) Rating of this vehicle (or tractor trailer comb.)?    [_____] lbs

3.) What is the model year of this vehicle and engine (if different)?    Vehicle: [_____]    Engine: [_____]

4.) Where is the home base of this vehicle?    State/Prov.: [_____]    Country: [_____]

5.) Where is this vehicle registered?    State/Prov.: [_____]    Country: [_____]

6.) How many miles is this truck driven per year (or month or week)?    [_____] miles per ..  [week / month / year]

7.) How many total days is this truck driven per year (or month or week)?    [_____] days per ..  [week / month / year]

8.) Where did you last load / unload this vehicle?    City: [_____]    State/Prov.: [_____]

9.) Where will you next load / unload this vehicle?    City: [_____]    State/Prov.: [_____]

10.) Name other CA destinations:   ☐ do not know    City: [_____]    → City: [_____]
       (before *next* exiting CA)   ☐ none    City: [_____]    City: [_____]
                                            City: [_____]

11.) How many total miles will this truck be driven in California (before *next* exiting CA on this trip)?    [_____] miles

12.) How many days will this truck travel in California (before *next* exiting CA on this trip, incl. today)?    [_____] days

13.) Where did you last fuel up this truck?    City: [_____]    State/Prov.: [_____]

14.) Where will you next fuel up this truck?    City: [_____]    State/Prov.: [_____]

15.) How many miles can you travel before refueling (from right now)?    [_____] miles

16.) How many times will you (or do you expect to) refuel this truck in California (before next exit)?    [_____] times

17.) Where and when will you exit California next?    Route/Hwy/City: [_____]    Date/day: [_____]

18.) How many *times per month* (or week or year) does this truck enter Calif.?    [_____] times per ..  [week / month / year]

19.) How many *days per month* (or week or year) does this truck travel in Calif.?    [_____] days per ..  [week / month / year]

20.) What is the total fuel capacity of this vehicle's fuel tank(s)?    [_____] gallons    [diesel / gasoline]

21.) What is this truck's average fuel economy (in mpg)?    [_____ . ___] miles per gallon (mpg)

22.) If you had up-to-the-minute information about parking areas and spaces
       available when you were deciding where to rest, would you use it?    ☐ Yes    ☐ No    ☐ Unsure
       -- If so, how would you like to receive parking info?    ☐ Road signs    ☐ Radio in truck  ☐ Cell phone  ☐ Internet
                                                                 ☐ GPS-based    ☐ Other: [_____]
       -- If this info indicated there was a space available where and when you wanted
          to park and rest, would you use a reservation service to secure the space?    ☐ Yes    ☐ No    ☐ Unsure
          -- If so, how would you like to reserve the parking spot?    ☐ Cell phone    ☐ Internet    Other: [_____]

**Figure 1 UC-Davis Truck Survey** *(reproduced from 15)*

Case 2:09-cv-05476-SVW-FFM   Document 1   Filed 07/27/09   Page 31 of 36   Page ID #:31

Rodier and Shaheen



**Figure 2 Survey Locations** (reproduced from *15*)

As documented in Figure 1, respondents were asked "If you had up-to-the-minute information about parking areas and spaces available when you were deciding to rest, would you use it?" The survey results are presented in Table 3 below. These results indicated that 67.9 percent of respondents would use such a service, 19.9 percent said they would not, six percent were unsure, and the remainder declined to answer the question.

Rodier and Shaheen                                                          12

**TABLE 3 Survey Responses on Use of Hypothetical Parking Information Service (15)**

| Origin State | Highway | Nearby City | Surveys Collected | Regarding Question #22a, the percent of survey respondents who.... | | | |
| | | | | Would use parking info | Would not use parking info | Are unsure about use of parking info | [blank] |
|---|---|---|---|---|---|---|---|
| Oregon | I-5 | Mt. Shasta, CA | 68 | 77.9% | 11.8% | 8.8% | 1.5% |
| Nevada | I-80 | Truckee, CA | 66 | 72.7% | 16.7% | 10.6% | 0.0% |
| | I-15 | Yermo, CA | 50 | 60.0% | 30.0% | 6.0% | 4.0% |
| Arizona | I-40 | Needles, CA | 72 | 70.8% | 22.2% | 4.2% | 2.8% |
| | I-10 | Banning, CA | 73 | 64.4% | 20.5% | 9.6% | 5.5% |
| Mexico | SR-7 | Calexico, CA | 33 | 57.6% | 15.2% | 0.0% | 27.3% |
| | SR-905 | San Diego, CA | 71 | 64.8% | 22.5% | 0.0% | 12.7% |
| All Trucks | | | 433 | 67.9% | 19.9% | 6.0% | 6.2% |

Among those respondents who indicated that they would use up-to-the-minute information about parking areas and spaces, most indicated that road signs (47.2 percent), mobile phones (21.6 percent), and radio (18.8 percent) were their preferred method of accessing this information, as shown in Table 4. Respondents indicated less interest in accessing this information by the Internet or GPS.

**TABLE 4 Survey Responses on Preferred Method of Receiving Parking Information (15)**

| Origin State | Highway | Nearby City | The percent of survey respondents who might use parking info ("yes" or "unsure" to #22a) that would opt to receive such info by [a] ... | | | | | |
| | | | Road Signs | Radio | Mobile Phone | Internet | GPS | "Other" |
|---|---|---|---|---|---|---|---|---|
| Oregon | I-5 | Mt. Shasta, CA | 50.8% | 30.5% | 13.6% | 6.8% | 10.2% | 15.3% |
| Nevada | I-80 | Truckee, CA | 54.5% | 16.4% | 14.5% | 10.9% | 9.1% | 12.7% |
| | I-15 | Yermo, CA | 60.6% | 21.2% | 6.1% | 9.1% | 3.0% | 30.3% |
| Arizona | I-40 | Needles, CA | 70.4% | 20.4% | 13.0% | 9.3% | 7.4% | 9.3% |
| | I-10 | Banning, CA | 50.0% | 27.8% | 20.4% | 9.3% | 7.4% | 35.2% |
| Mexico | SR-7 | Calexico, CA | 21.1% | 0.0% | 31.6% | 26.3% | 0.0% | 21.1% |
| | SR-905 | San Diego, CA | 4.3% | 0.0% | 58.7% | 4.3% | 0.0% | 32.6% |
| All Trucks | | | 47.2% | 18.8% | 21.6% | 9.4% | 6.3% | 21.6% |

[a] More than one response to this question was allowed per survey

-32-

Rodier and Shaheen

Among those respondents who indicated that they would use up-to-the-minute information about parking areas and spaces, 45.9 percent indicated that they would use the service to reserve a parking spot (see Table 5) most preferably by mobile phone (56.6%), by Nextel(24.6 percent), and by the Internet (9.7 percent) (see Table 6).

**TABLE 5 Survey Responses on Willingness to Use Parking Place Reservation Service (*15*)**

| Origin State | Highway | Nearby City | For survey respondents who would use parking info ("yes" or "unsure" to #22a), the percent of respondents who... | | | |
|---|---|---|---|---|---|---|
| | | | Would reserve a parking spot in advance | Would not reserve a spot | Are unsure | [blank] |
| Oregon | I-5 | Mt. Shasta, CA | 49.2% | 32.2% | 13.6% | 5.1% |
| Nevada | I-80 | Truckee, CA | 41.8% | 52.7% | 5.5% | 0.0% |
| | I-15 | Yermo, CA | 39.4% | 48.5% | 3.0% | 9.1% |
| Arizona | I-40 | Needles, CA | 25.9% | 59.3% | 9.3% | 5.6% |
| | I-10 | Banning, CA | 33.3% | 33.3% | 18.5% | 14.8% |
| Mexico | SR-7 | Calexico, CA | 68.4% | 31.6% | 0.0% | 0.0% |
| | SR-905 | San Diego, CA | 80.4% | 15.2% | 2.2% | 2.2% |
| All Trucks | | | 45.9% | 39.7% | 8.8% | 5.6% |

**TABLE 6 Survey Responses on Preferred Method of Reserving Truck Parking Place (*15*)**

| Origin State | Highway | Nearby City | For survey respondents who might use parking info ("yes" or "unsure" to #22a) and might reserve a parking spot ("yes" or "unsure" to #22c), the preferred means of making a reservation are... | | | | |
|---|---|---|---|---|---|---|---|
| | | | Mobile Phone | Internet | Nextel[a] | Other | Blank |
| Oregon | I-5 | Mt. Shasta, CA | 86.5% | 5.4% | 0.0% | 5.4% | 2.7% |
| Nevada | I-80 | Truckee, CA | 88.5% | 3.8% | 0.0% | 0.0% | 7.7% |
| | I-15 | Yermo, CA | 85.7% | 0.0% | 0.0% | 0.0% | 14.3% |
| Arizona | I-40 | Needles, CA | 84.2% | 10.5% | 0.0% | 0.0% | 5.3% |
| | I-10 | Banning, CA | 57.1% | 21.4% | 0.0% | 0.0% | 21.4% |
| Mexico | SR-7 | Calexico, CA | 0.0% | 30.8% | 69.2% | 0.0% | 0.0% |
| | SR-905 | San Diego, CA | 0.0% | 5.3% | 89.5% | 5.3% | 0.0% |
| All Trucks | | | 56.6% | 9.7% | 24.6% | 2.3% | 6.9% |

[a] *walkie-talkie-type mobile phone service*

Rodier and Shaheen                                                                    14

## CONCLUSIONS

This report began with a literature review of the commercial vehicle truck parking problems in California and the U.S., including the distribution and frequency of current and expected truck parking shortages and illegal parking, available evidence on truck drivers' parking preferences, and a description and evaluation of current and future approaches to the truck parking problem. The results of this literature review indicated that the provision of parking information-related services may be a promising near-term solution to the truck parking problem. As a result, the authors worked with researchers at the University of California at Davis to include questions related to truck parking information services in a statewide survey of truckers conducted for the California Air Resources Board. The results indicated that almost 70 percent of the truckers surveyed would use up-to-the-minute information about parking areas and spaces when planning their next rest. Among these respondents, most indicated that road signs, mobile phones, and radio were their preferred method of accessing this information, and almost half indicated that they would reserve a parking spot in advance, most preferably, by mobile phone.

## ACKNOWLEDGMENTS

The authors would like to thank the California Department of Transportation and California PATH for their support of this research. Matt Hanson and Nader Ebrahimi of Caltrans and Steve Sowers, formerly of Caltrans, provided valuable expertise. A special thanks to the California Air Resources Board and Nicholas Lutsey and CJ Brodrick for allowing the inclusion of questions on parking information in their statewide trucker survey. The authors would also like to acknowledge the assistance of Megan Smirti. The contents of this report reflect the views of the authors, who are responsible for the facts and the accuracy of the data presented herein.

Rodier and Shaheen                                                                                    15

**REFERENCES**

1. Fleger, S. A, R. P. Haas, J. W. Trombly, R. H. Cross III, J. E. Noltenius, K. K. Pécheux, and K. J. Chen. *Study of Adequacy of Commercial Truck Parking Facilities – Technical Report.* Publication FHWA-RD-01-158. Federal Highway Administration, U.S. Department of Transportation, 2002.

2. California Department of Transportation, 2001. *Partners for Adequate Parking Facilities Initiative Final Status Report.* Received from Caltrans on March 3, 2006.

3. Chen, K.J., K.K. Pecheaux, J. Farbry, Jr., and S.A. Fleger. Federal Highway Administration. *Study of Adequacy of Commercial Truck Parking Facilities – Technical Report,* 2002.

4. NATSO's History Homepage. National Association of Truckstop Operators, 2005. www.natso.com. Accessed April 27, 2006.

5. National Transportation Safety Board. *Truck Parking Areas.* Highway Special Investigation Report NTSB/SIR-00/01. Washington, DC. National Transportation Safety Board, 2000.

6. Maryland Department of Transportation. *Maryland Truck Parking Study,* Federal Highway Administration, U.S. Department of Transportation, 2005.

7. Trombly, J.W. *Dealing with Truck Parking Demands.* National Cooperative Highway Research Program, Synthesis 317, National Research Council, Washington, D.C., 2003

8. Quan, K. Truck Parking Issues and Programs. Presented at Talking Freight Seminar, Federal Highway Administration, United States Department of Transportation, July 2006.

9. U.S. Government Accountability Office. *EPA could take additional steps to help maximize the benefits from the 2007 diesel emissions standards* (GAO Report GAO-04-313), 2004.

10. American Lung Association, 2000. *Diesel exhaust and air pollution.* Retrieved July 20th, 2006, from

11. Palaniappan, M. Ditching diesel: community-driven research reduces pollution in West Oakland. *Race, Poverty, and the Environment.* Retrieved October 1, 2006, from

12. Smith, S.B., W. Baron, K. Gay, and G. Ritter.United States Department of Transportation. *Intelligent Transportation Systems and Truck Parking.* Federal Motor Carrier Safety Administration. Washington, D.C. October 2004.

13. Lutsey, N, C.J. Brodrick, D. Sperling, and C. Oglesby. Heavy-Duty Truck Idling Characteristics. In *Transportation Research Record: Journal of the Transportation Research Board, No.* 1880, TRB, National Research Council, Washington, D.C., 2004, pp. 23-33.

Rodier and Shaheen                                                                                16

14. Thompson, R.G. and P. Bonsall. Drivers' response to parking guidance and information systems. *Transport Reviews, Vol. 17*, No. 2, 1997, pp. 89-104.

15. Lutsey, N. and C.J. Brodrick. *Assessment of Out-of-State Heavy-Duty Trucks Activity Trends in California*. Institute of Transportation Studies, University of California, Davis. *Forthcoming*, 2007